IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| QUANTUM FITNESS CORPORATION and BIO-MATRIX INTERNATIONAL CORP., Plaintiffs, | § § § § |
| V. | §   CIVIL ACTION NO. H-14-0763 |
| CYBEX INTERNATIONAL, INC., COMM-FIT, L.P., BUSHTIK, LLC, and KYLE W. SMITH, Defendants. | § § § § § § |

## MEMORANDUM AND ORDER

Before the Magistrate Judge upon referral from the District Judge is Defendants' Motion to Exclude the Expert Report and Testimony of Alice Hilton and Rob Hancock (Document No. 71), in which Defendants seek an Order excluding the report and damages opinions of Plaintiffs' experts, Alice Hilton and Rob Hancock. Related to that motion is Defendants' Motion to Strike the Affidavit of Plaintiffs' Expert Alice Hilton (Document No. 102) and Defendant Cybex International, Inc.'s Motion to Strike Plaintiffs' Exhibit H-1 (Document No. 113). Also pending is Defendant Cybex International, Inc.'s Motion to Strike Plaintiffs' Untimely Damages Theory and Calculations and Motion for Sanctions (Document No. 105) and Plaintiffs' Motion in Limine to Exclude Expert Witness, Jared Jordan (Document No. 61).

Having considered all the motions, the responses, the parties' oral argument at a hearing held on September 14, 2015, and the applicable law, it is ORDERED, for the reasons set forth below, that each of Defendants' motions (Document Nos. 71, 102, 105, and 113) are DENIED, and Plaintiff's Motion in Limine to Exclude Expert Witness, Jared Jordan (Document No. 61) is also DENIED.

I.     **Background**

Plaintiffs' experts, Alice Hilton and Rob Hancock, prepared a joint expert report containing opinions on Plaintiffs' economic damages, with Alice Hilton preparing a lost profits analysis and opinion and Rob Hancock preparing a "Reasonableness Test - Lost Value of Direct Sales Business Segment." That Joint report is essentially five pages in length and contains the following lost profits opinion of Alice Hilton: "Quantum lost past and future profits of $7,150,000 for the period of March 1, 2012 through December 31, 2024." (Document No. 71-2 at 6). The bases for that opinion are contained in the report as follows:

> Quantum has been in the business of manufacturing and selling commercial fitness equipment since 1990. Its direct sales business provides strength and/or cardiovascular fitness equipment for entities such as medical and rehabilitation facilities, recreational centers, fitness clubs, corporate wellness, multi-family and residential communities. In addition, Quantum sells equipment as a dealer for other fitness equipment manufacturers ("dealer sales"). New construction of commercial facilities and residential communities is the primary driver of Quantum's direct sales, with a lag time of roughly a year from a new building permit to a sale.
>
> In 2007 and 2008, sales to multi-family and residential communities accounted for roughly half or more of Quantum's direct sales. A review of new building permits for multi-family construction for the years 2004 through 2013 illustrates the strong correlation between the number of new multi-family building permits and Quantum's direct sales revenue.
>
> Quantum's business was negatively impacted by the economic decline of the Great Recession which statistically lasted from December 2007 through June 2009. Multi-family building permits issued in Harris County significantly declined between 2008 and 2009. To ride out this economic decline, Quantum successfully worked towards downsizing its operations.
>
> By the end of 2010, new multi-family building permits had increased by 63% from 2009 permit numbers and by the end of 2012 the increase was over 103% from 2011 permit numbers. Given the lag time from permitting to direct sales, Quantum was expected to increase its sales by 2012.
>
> Kyle Smith ("Smith") was Quantum's salesperson from March 2001 through March 30, 2012. On March 4, 2003, Smith executed an employment agreement and a confidentiality agreement. On March 11, 2003, Smith executed a non-competition

> agreement. ("Agreements"). Under his non-competition agreement, he was restricted for two years from soliciting or engaging in any direct or indirect sales with existing or potential customers of Quantum within 200 miles of 10245 West Airport Blvd., Stafford, Texas (Quantum's address). On or about March 21, 2012, Smith tendered his resignation and March 30, 2012 was his last day of employment with Quantum. Thereafter, he became the Houston-based employee of Comm-Fit, L.P. ("Comm-Fit"), a Dallas-based commercial fitness equipment seller. I have assumed the damage period began on March 1, 2012 due to indications that Smith was allegedly diverting Quantum's sales prospects to the Defendants prior to his resignation. I have assumed that Smith's alleged breach of the Agreements with Quantum negatively impacted Quantum's business.
>
> Rather than direct sales increasing based on the strong growth in new building permits, by the end of 2012 Quantum's direct sales declined by 21% from the previous year. From the end of 2012 to the end of 2012, Quantum's direct sales dropped by 47% despite the continued increase in the number of multi-family new building permits issued in Harris County.
>
> **LOST PROFITS**
>
> Based upon my review of Quantum's historical direct sales for the years 2004 through September 2014, and to assist the trier-of-fact in this matter, I have calculated the present value of lost profits over a roughly ten year period from the time of this report (March 2012 through December 2024). Based upon the annual percentage increases in Harris County's multi-family building permits, I assumed an increase in direct sales each year from March 2012 through 2015. Thereafter, sales are assumed to remain constant. To account for saved costs, I deducted variable costs associated with direct sales, using Quantum's historical average of 41%, to arrive at net direct profits. The economic burden of Smith's compensation has been replaced by the time, toil and effort of Caren Ayton, Vice President of Quantum. Nevertheless, the burden of fixed costs is considered and taken into account in the discount rate used to present value lost profits. Therefore, my lost profits are reduced from what they would be without this consideration. The present value of lost profits from March 1, 2012 through December 31, 2024 is $7,150,000. The trier-of-fact may use Schedule 2 to view the lost profits calculations on a year-by-year and cumulative basis.

(Document No. 71-2 at 6-9) (footnotes omitted). Rob Hancock, in his "Reasonableness Test-Lost Value of Direct Sales Business Segment," then opined that the lost value of Quantum's direct sales business, an alternate form and measure of economic damages, was $7,970,000. Hancock relayed that opinion and the type of calculations used to arrive at that opinion as follows in the Joint Report:

> As previously stated, annual pre-tax profits from the direct sales business segment would not have been impaired but-for the alleged actions of the Defendants. I have calculated the vale of the direct sales business segment on or about March 1, 2012 at $7,970,000. This business segment does not represent the total business enterprise of Quantum Fitness Corporation due to the presence of the dealer sales business segment.
>
> I calculated my assessment of value pursuant to the American Institute of Certified Public Accountants Statement on Standards for Valuation Services #1 ("SSVS 1"). Further, I applied protocols and procedures for valuing a business segment or other composite assets of a business enterprise, pursuant to the Financial Accounting Standards Board ASC 805 (formerly 141R).
>
> Utilizing the expected earnings from the direct sales business segment and employing the income approach and discounted future cash flows methodology, I calculated the value at $7,970,000 as shown on Schedule 3.
>
> It would be duplicative to add the lost past and future profits to the business loss value since the lost past and future profits are a part of the calculation of lost business value. Therefore, lost business segment value is an alternative measure of economic damages and should not be combined with lost profits.

(Document No. 71-2 at 9-10).

Defendants, in their Motion to Exclude the Report and Testimony of Alice Hilton and Rob Hancock (Document No. 71) primarily argue that the lost profits opinion of Alice Hilton is based on a flawed and unreliable methodology. In particular, Defendants focus primarily on Hilton's use of a correlation between Quantum's direct sales and multi-family building permits in Harris County, arguing that: (1) "a substantial portion of Quantum's direct sales took place outside of Harris County and even outside the state of Texas;" (2) "the vast majority of Quantum's direct sales were to customers that are not characterized as multi-family building customers;" (3) Hilton's use of a "one year lag time is "unsupported by any reliable data;" and (4) the permit data used by Hilton does not accurately represent the number of multi-family buildings. Defendants then argue that Rob Hancock's opinion as to lost business value is flawed because it relies on, and is based on, the same, flawed "correlation" methodology used by Hilton in her lost profits analysis.

**II.    Legal Standard**

The admissibility of expert testimony is governed by FED. R. EVID. 702, which states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 and the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786 (1993) apply to technical or specialized expert testimony. *See Kuhmo Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1171 (1999); *Black v. Food Lion, Inc.,* 171 F.3d 308, 310 (5th Cir. 1999).

The district court has a "gate-keeping" role when determining the admissibility of expert testimony. *See Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). The court must determine whether an expert is qualified and whether his testimony is reliable and relevant. The purpose is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire*, 119 S. Ct. at 1176. The *Daubert* inquiry is always fact-specific. *See Black*, 171 F.3d at 311.

Whether an expert is qualified depends on if the witness has "such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir.1992)), *cert. denied*, 126 S. Ct. 1022 (2006); *see also Taylor Pipeline Construction, Inc. v. Directional Road Boring, Inc.*, 438 F.Supp.2d 696, 705 (E.D. Tex. 2006). Determining whether an expert's testimony is reliable requires "an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Curtis v.*

*M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). The party seeking to introduce expert testimony bears the burden of demonstrating that the expert's findings and conclusions are reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc), *cert. denied*, 119 S. Ct. 1454 (1999). "The proponent need not prove to the judge that the expert's testimony is correct, but [he] must prove by a preponderance of the evidence that the testimony is reliable." *Id.*; *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) ("Although the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does *not* judge the expert's conclusions themselves.").

Five non-exclusive factors are generally used to aid in determining whether an expert's methodology is reliable:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore*, 151 F.3d at 275 (citing *Daubert*, 113 S. Ct. at 2796-97). Not all of the factors will necessarily apply to every expert's testimony. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990-91 (5th Cir. 1997). The court should first decide whether the factors mentioned in *Daubert* apply, and then consider whether other factors not mentioned in *Daubert* are relevant to the case. *See Black*, 171 F.3d at 311-12.

### III. Discussion

The opinions of Alice Hilton and the bases therefore are contained in the Joint Report of Alice Hilton and Rob Hancock and supporting documentation, Alice Hilton's deposition testimony, the affidavit of Alice Hilton submitted by Defendants in response to Defendants' Motion to Exclude,

and a "correlation co-efficient" calculation (Plaintiffs' Exhibit H-1). As both the affidavit of Alice Hilton and her correlation co-efficient calculation have bearing on the *Daubert* issues raised by Defendants, both are proper for consideration and Defendants' two Motions to Strike (Document Nos. 102 and 113) are DENIED.

As for the reliability of Alice Hilton's lost profits opinions, Defendants' challenges are based primarily on her use of Harris County "multi-family building permits" as a predictive measure of Plaintiffs' lost direct sales. According to Defendants, the number of multi-family building permits has nothing to do with the sales of commercial fitness equipment, Hilton misinterpreted the multi-family building permit data she used, and Hilton failed to account for the fact that not all of Plaintiffs' direct sales occurred, or could be expected to occur, in Harris County. Additionally, Defendants complain that there is no basis for Hilton's use of a "one year lag time" between the issuance of a multi-family building permit, and an expected sale of commercial fitness equipment. Each of these complaints is insufficient to warrant the exclusion of Alice Hilton's opinions, particularly given the statistically significant correlation (79% correlation co-efficient) found by Hilton between Plaintiffs' historical direct sales data and both the timing and number of multi-family building permits issued in Harris County. That statistically significant correlation found by Hilton implicates, in Plaintiffs' favor, both the "testing" and "rate of error" *Daubert* factors.[1]

"Expert statistical opinions are often offered to demonstrate a causative relationship between a dependent variable and an explanatory variable because the existence *vel non* of a causal link is a legally relevant fact of consequence." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

---

[1] None of the other three *Daubert* factors has any clear applicability to the opinions and methodology used by Hilton.

Here, as represented by Plaintiffs' counsel at the September 14, 2015, motion hearing, the opinions of Alice Hilton are not offered to prove causation – that is, that Defendants' conduct caused Plaintiffs' damage. Instead, her opinions are offered to quantify the amount of Plaintiffs' damages. And in that sense, both the trend analysis she relies on and the mathematical and graphical representation of the correlation between Quantum's direct sales of commercial fitness equipment and the timing and number of Harris County multi-family building permits provide a sufficiently reliable basis for Hilton's lost profits calculations. *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F.Supp.2d 776, 792 (N.D. Tex. 2013) ("reliance on historical sales patterns is permissible"); *Arthur J. Gallagher & Co. v. Babcock*, Civil Action No. 08-185, 2011 WL 121889 *3-4 (E.D. La. Jan. 10, 2011) ("the fact that [an expert] must use projections of lost profits to prove the amount of damages does not render the calculations unreliable."). Defendants' argument that there is no connection between multi-family building permits and Quantum's historical direct sales of commercial fitness equipment is belied by Hilton's calculated 79% correlation coefficient, and well as the reasonable and logical premise utilized by Hilton that commercial fitness equipment sales rise when the building of multi-family dwellings is on the rise. As for Defendants' complaints about what the permit data Hilton used really shows (number of apartment units versus number of buildings/complexes), and Hilton's failure to take into account Plaintiffs' sales outside of Harris County, each argument goes to the weight of Hilton's opinions, and not the reliability of the correlation found. *See e.g., Key Energy Services, Inc. v. C.C. Forbes, LLC,* Civil Action No. 2:08-cv-346-CE, 2011 WL 7429433 (E.D. Tex. June 3, 2011) (allowing expert lost profits opinion testimony despite complaints that court found could be explored through vigorous cross-examination); *Amigo Broadcasting, L.P. v. Spanish Broadcasting System, Inc.*, No, A-05-CA-193-LY, 2006 WL 5503872 (W.D. Tex. Apr. 21, 2006)

(allowing lost profits expert opinion testimony despite complaints about the opinions which the court found went to the weight of the opinions, not admissibility). In addition, Defendants' complaints about Hilton's use of a one-year lag time from the time a multi-family building permit is issued to establish a correlation between rising sales again go to the weight of her opinions – not their reliability. Hilton explained in her affidavit that she learned from her interview(s) with Brooke and Caren Ayton, her independent research and her own general knowledge that multi-family buildings "take approximately one year to complete after the work begins, and that no work can begin until the permits are issued." Affidavit of Alice Hilton (Document No. 85-2) at ¶ 5. Hilton's use of the one-year lag time has sufficient factual and methodological support.

Defendants' complaints about Rob Hancock's damages opinions, which are premised almost entirely on their complaints about Alice Hilton's opinions, are likewise rejected. Rob Hancock, as established by Plaintiffs, is qualified to conduct the type of business valuation calculations he made in this case, and the method(s) he used for his valuation opinions are generally acceptable. The underlying data he used and/or any reliance on Alice Hilton's opinions and analysis can be challenged through cross-examination.

As for the rebuttal opinions of Defendants' expert, Jared Jordan, while Plaintiffs claim that he does not have sufficient knowledge and/or understanding of the commercial fitness industry, he is sufficiently qualified to offer *rebuttal* opinions to counter or call into question the validity of the damages opinions and calculations of Alice Hinton and Rob Hancock. *See Rushing v. Kansas City Southern Railway Co.*, 185 F.3d at 496, 540 (5th Cir. 1999) (the threshold for finding an expert "qualified" is not particularly high), *cert. denied*, 528 U.S. 1160 (2000).

Both sides' expert motions (Document Nos. 61, 71, 102 and 113) are therefore DENIED.

That leaves Defendant Cybex International, Inc.'s Motion to Strike Plaintiffs' Untimely Damages Theory and Calculations and Motion for Sanctions (Document No. 105). In that motion, Defendant Cybex International, Inc. complains about the damages calculations made by Brooke Ayton, in an Affidavit submitted by Plaintiffs in response to Defendant Cybex International. Inc.'s Motion for Summary Judgment (Document No. 95-6). According to Defendant Cybex, Brooke Ayton's opinions that his company's damages can be measured by the sales gains made by Defendant Comm-Fit is a damages theory that was never disclosed by Plaintiffs, and is contrary to Plaintiffs' representations that Brooke Ayton would not provide an opinion – expert or otherwise – on Plaintiffs' damages.

A business owner may offer lay opinions as to the damages suffered by his business as a result of a defendant's tortious conduct. *Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (a lay witness can testify about a company's lost profits under FED. R. EVID. 701 "if the witness has direct knowledge of the business accounts underlying the profit calculation"). Here, Brooke Ayton's opinions on Plaintiffs' damages is based on his knowledge and experience as a business owner, his evaluation of the revenue and sales data of his company and Defendant Comm-Fit both before and after the alleged tortious conduct, and his mathematical calculation of his company's alleged damages. His opinions, as expressed in his Affidavit, are not "expert opinions" because they do not rely on scientific, technical or other specialized knowledge. In addition, his lay business owner opinion on Plaintiffs' damages is not excludable because it was not offered earlier. As explained by Plaintiffs' counsel at the September 14, 2015, hearing, Brooke Ayton did not have all the facts and data upon which his lay business owner opinion is based until early June 2015. In addition, Defendants were given the opportunity to depose Brooke Ayton for an additional two hours

on "subjects and issues which were not raised during" the previous deposition, but declined to do so. Defendant Cybex International, Inc.'s Motion to Strike Plaintiffs' Untimely Damages Theory and Calculations and Motion for Sanctions (Document No. 105) is DENIED. Defendant may, however, object to any part of Brooke Ayton's affidavit, testimony, or lay opinion that is not based on "personal knowledge."

### IV.  Conclusion and Order

Based on the foregoing and the conclusion that the expert opinions in this case sufficiently meet the reliability standards set forth in FED. R. EVID. 702 and *Daubert*, and that Brooke Ayton's lay business owner opinion on Plaintiffs' damages is not subject to being excluded, it is

ORDERED that Defendants' Defendants' Motion to Exclude the Expert Report and Testimony of Alice Hilton and Rob Hancock (Document No. 71), Defendants' Motion to Strike the Affidavit of Plaintiffs' Expert Alice Hilton (Document No. 102) and Defendant Cybex International, Inc.'s Motion to Strike Plaintiffs' Exhibit H-1 (Document No. 113) are all DENIED; Defendant Cybex International, Inc.'s Motion to Strike Plaintiffs' Untimely Damages Theory and Calculations and Motion for Sanctions (Document No. 105) is DENIED; and Plaintiffs' Motion in Limine to Exclude Expert Witness, Jared Jordan (Document No. 61) is DENIED.

Signed at Houston, Texas, this 16th day of September, 2015.

Frances H. Stacy
United States Magistrate Judge